# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

**BASIN WATER, INC., et al.,**[1]

                          Debtors.

Chapter 11

Case No. 09-12526 (MFW)

(Joint Administration Pending)

## DEBTORS' MOTION FOR ENTRY OF ORDER, PURSUANT TO 11 U.S.C. §§ 105(A), 363, 365, 503, AND 507 AND FEDERAL BANKRUPTCY RULES 2002 AND 6004, (A) APPROVING BID PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE SELLERS' ASSETS; (B) SCHEDULING A HEARING TO CONSIDER THE SALE AND APPROVING THE FORM AND MANNER OF NOTICES; (C) ESTABLISHING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS;(D) AUTHORIZING PAYMENT OF A BREAK-UP FEE AND EXPENSE REIMBURSEMENT; AND (E) GRANTING RELATED RELIEF

Basin Water, Inc. and its affiliate Basin Water-MPT, Inc., the debtors and debtors in possession in the above cases (collectively, the "Debtors" or "Sellers"), by and through their undersigned counsel, hereby file this motion (the "Motion"), pursuant to §§ 105(a), 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order (A) approving certain bid procedures, which are attached hereto as Exhibit 1 (the "Bid Procedures"), for the proposed sale of substantially all of the Debtors' assets (the "Assets") as set forth in that certain asset purchase agreement (the "Agreement")[2] by and among the Debtors and Amplio Filtration Holdings, Inc., a Delaware

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Basin Water, Inc. (6881) and Basin Water-MPT, Inc. (9465). The corporate headquarters address for all of the Debtors is 9302 Pittsburgh Ave., Suite 210, Rancho Cucamonga, CA 91730.

[2]     All capitalized terms shall have the meaning ascribed to them in the Bid Procedures unless otherwise defined herein.

corporation (the "Buyer"); (B) scheduling a hearing (the "Sale Hearing") and approving the form and manner of notice of the Auction and the Bid Procedures; (C) establishing procedures for the potential assumption and assignment of certain executory contracts and unexpired leases (the "Contracts"), including notice of proposed cure amounts; (D) authorizing Debtors to pay to the Buyer an Expense Reimbursement and Break-Up Fee under certain terms and conditions set forth more particularly below; and (E) granting related relief. The facts and circumstances supporting this Motion are set forth in the concurrently filed Declaration of Scott B. Hamilton in Support of First Day Motions (the "First Day Declaration"). In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are §§ 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.

## GENERAL BACKGROUND

2.     On July 16, 2009 (the "Petition Date"), the Debtors all commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     No request for appointment of a chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

## HISTORY AND OPERATIONS

4.      Basin Water was originally incorporated as Basin Water Technology Group, Inc. in 1999 as a California corporation and, in May 2006, it reincorporated as Basin Water, Inc., a Delaware corporation, in connection with its initial public offering. Headquartered in Rancho Cucamonga, California, Basin Water designs, builds and implements systems for the treatment of contaminated groundwater, industrial process water, and air streams from municipal and industrial sources.  Through its systems and maintenance services, Basin Water provides reliable sources of drinking water for many communities, and the ability to comply with environmental standards and recover valuable resources from process and waste water streams.

5.      Basin Water's stock is publicly traded on the NASDAQ Global Market under the symbol "BWTR".  As of June 30, 2009, there were 5,479 holders of Basin Water's common stock.

6.      The Debtors' operations from 1999 until 2001 consisted primarily of research and development activities, as the Debtors developed their proprietary ion-exchange process and developed a groundwater treatment system for commercialization of their proprietary process.  The Debtors successfully completed a prototype for their groundwater treatment system in May 2002, and shortly thereafter assisted one of their customers in submitting an application with the California Department of Health Services ("DHS") for a permit to operate the Debtors' system for treatment of nitrate.  In June 2002, the first permit for the operation of the Debtors' system was issued and the Debtors received their first sales revenues that same year.

DB02:8479765.1                                    068172.1001

7. From 2002 through 2006, the Debtors focused their efforts on developing systems that could treat other contaminants, increasing their engineering workforce, developing their sales and marketing force, obtaining patents, and improving their internal finance and accounting capabilities.

8. In September 2007, Basin Water acquired Basin MPT as a wholly owned subsidiary.[3] Basin MPT is a provider of technology and services to the water treatment and industrial process markets. Basin MPT owns or has pending domestic and foreign patents and registered trademarks related to the various chemical and filtration processes that form the core of the Debtors' businesses.

9. In the past recent years, the Debtors derived most of their revenues from designing, assembling and servicing their proprietary ion-exchange systems for the treatment of contaminated groundwater for use as drinking water. In 2008, the Debtors derived substantially all of their revenues from their proprietary, ion-exchange, onsite regenerable treatment system. That system reduces groundwater contaminant levels in what the Debtors believe is an efficient, flexible and cost-effective manner. The Debtors' system produces very low waste rates, can effectively treat medium-to-high volume requirements and is capable of removing multiple chemical contaminants at a single site. These systems regenerate the resin—a filtration product—by using a salt brine solution to remove the contaminants from the resin so that it can be used again in the ion-exchange process. The Debtors market these systems to utilities, cities,

---

[3] Basin Water additionally has two (2) other wholly-owned subsidiaries that are not debtors in these cases. These entities include Basin Water Resources, Inc. (a wholly-owned, non-operating subsidiary of Basin Water formed to hold the Debtors' stock in Empire Water Corporation) and BionBasin, Inc. (a wholly-owned subsidiary of Basin Water in which a minority interest was issued to Opus Trust, Inc. as part of a water treatment unit sale in 2006, but which minority interest was reacquired in February 2009 from Opus Trust, Inc. in a settlement among Basin Water, Opus Trust, Inc., BionBasin, Inc. and Martin Benowitz, individually and as Trustee of the Martin A. Benowitz Qualified Profit Sharing Plan).

municipalities, special districts, real estate developers and other organizations for use in treating groundwater that does not comply with federal or state drinking water regulations due to the presence of chemical contaminants.

10.     Also, in 2008, the Debtors continued initiatives, both external and internal, to facilitate their transformation into a water services company focused on development of a technology and service business model. Using this model, the Debtors have sought out opportunities to combine proprietary or specialized technologies with long-term relationships built through performance-based service agreements to meet groundwater treatment, industrial water and wastewater treatment and resource recovery needs.

11.     In 2008, the Debtors also acquired their bioreactor and biofilter business (which the Debtors refer to as "Envirogen") from Shaw Environmental & Infrastructure, Inc. The Envirogen business designs and supplies fluidized bed, membrane and suspended carrier bioreactors for the treatment of groundwater and wastewater streams in industrial, municipal and federal applications and designs and supplies biofilters for the treatment of air streams from municipalities and industry for the removal or odor-causing and other contaminants.

12.     Currently, Basin Water has 82 full time employees and has facilities and operations in Rancho Cucamonga, California; Memphis, Tennessee; Phoenix, Arizona; Kingwood, Texas; and Lawrenceville, New Jersey.

13.     The Debtors have no secured bank debt and as of the Petition Date, the Debtors estimate that they have approximately $3.7 million in cash. The Debtors estimate that they have approximately $2 million in pre-petition unsecured trade debt as of the Petition Date, exclusive of any litigation-related claims, as discussed below.

068172.1001

## Events Leading to Commencement of Chapter 11 Cases

14.     Due to the limited operating history of the Debtors and the fact that the Debtors did not generate their first revenues until 2002, they have historically operated at a net loss. In 2007 and 2008, the Debtors experienced significant net losses from operations which, absent commencement of these cases, the Debtors currently believe would have continued into the foreseeable future. Several factors – in addition to their limited generation of revenue – have contributed to Debtors' need to file these cases. Beginning in 2006, the Debtors' net losses were exacerbated by projects and/or long term contracts that have operating costs in excess of revenues, which the Debtors believe could continue in the foreseeable future. In addition, in late 2006 and throughout 2007 and 2008, the Debtors implemented several initiatives to improve their business model, including, but not limited to, the acquisition of the Basin MPT business, acquisition of the Envirogen business, development of strategic alliances with industry leaders, recruitment of experienced management, technology and sales talent to expand and promote the Debtors' products, development of new and expanded technology and related service offerings, and expansion of the Debtors' customer base to include the industrial marketplace. While the Debtors believe that these initiatives have had varying degrees of success and are ongoing, they have been costly and time consuming to implement.

15.     Lastly, in the past two (2) years, the Debtors have incurred significant costs in connection with several lawsuits commenced against them including a consolidated securities class actions and two (2) purported shareholder derivative lawsuits. These additional costs have exacerbated the Debtors' already existing liquidity and revenue generation shortfalls.

16.     In light of the foregoing, the Debtors, in consultation with their professional advisors, considered potential sales and restructuring alternatives in order to

develop a plan that would maximize value for its creditors and to ensure the long-term survival of their business.  In October 2008, Basin Water engaged investment banking firm Canaccord Adams to assist the board of directors in evaluating the Debtors' strategic alternatives, including, but not limited to structured financing and/or a sale of substantially all of the Debtors' assets as a going concern.  Beginning in December 2008, the Debtors commenced a process, largely directed by Canaccord Adams, to solicit interest in a possible investment and/or strategic or financial acquisition of the Debtors.  From December 2008 through mid-May 2009, Canaccord Adams communicated to at least 29 potentially interested parties.  Of those 29 parties, 5 performed extensive due diligence regarding a potential investment in or acquisition of the Debtors and/or their businesses.  During this process, these parties engaged in various management meetings, participated in investor presentations and were granted access to an extensive due diligence data room.  Ultimately, in mid-May 2009, Amplio Group, S.A. ("Amplio"), an affiliate of Buyer, executed a letter of intent to acquire substantially all of the Debtors' assets; no other potentially interested party has made any commitments with respect to a potential acquisition and/or investment in the Debtors.

17.    Accordingly, concurrently with the filing of this Motion, the Debtors filed this Motion and the *Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(A), 363 and 365 and Federal Bankruptcy Rules 2002, 6004, 6006, and 9014, (A) Approving Asset Purchase Agreement and Authorizing the Sale of Assets of Debtors Outside the Ordinary Course of Business; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Interests and Encumbrances; (C) Authorizing the Assumption and Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief* (the "Sale Motion").

18.     Had the Debtors not commenced these cases, their ability to fund, sell or restructure their business, maximize value and preserve and enhance the Debtors' financial health would likely have been severely compromised.  The commencement of these cases and implementation of an orderly sale process under the supervision of this Court, with the proposed stalking horse bidder providing a floor against which interested parties may bid, will permit the Debtors to consummate a going-concern sale of all or substantially all of their assets and maximize value of their estates for all interested parties.

## RELIEF REQUESTED

19.     By this Motion, the Debtors respectfully request entry of an order (a) approving the Bid Procedures; (b) scheduling the Sale Hearing and approving the form and manner of notice of the Auction and the Bid Procedures; (c) establishing procedures for the potential assumption and assignment of certain Contracts (as defined below), including notice of proposed cure amounts; (d) authorizing Debtors to pay to the Buyer a break–up fee and expense reimbursement under certain terms and conditions set forth more particularly below; and (e) granting related relief.

*A.*      *The Proposed Sale*

20.     As discussed above, the Debtors retained Canaccord Adams as their investment banker in October 7, 2008, and began a process of exploring strategic alternatives, including a potential sale or restructuring of the Debtors' business.  The Debtors, in consultation with their professionals, and other interested parties, considered potential sales and restructuring alternatives in order to develop a plan that would maximize value for their creditors and to ensure the long-term survival of their business.  After considering their options, the Debtors determined that the floor established by a purchase of all or substantially all of the Assets by the Buyer, subject to higher and better bids pursuant to a Bankruptcy Court-approved,

open auction process pursuant to section 363 of the Bankruptcy Code (the "Proposed Sale"), afforded them the best opportunity to maximize value for their creditors.

21.    Although the Debtors will consider all Bids submitted in accordance with the Bid Procedures, they will favor bids that maximize the value of their estates. Further, the Debtors propose to sell, assign and transfer title to the Assets free and clear of Encumbrances, with such Encumbrances to attach to the net proceeds of the Sale, if any.

**B.    *The Asset Purchase Agreement***

22.    On or about July 15, 2009, the Sellers entered into the Agreement with the Buyer under which the Buyer would acquire substantially all of the Assets. A true and correct copy of the Agreement is attached to the Sale Motion filed concurrently herewith.

23.    The material terms of the Agreement are as follows:[4]

a.    Purchase and Sale of Assets.

1.    Upon and subject to the terms and conditions of the Agreement, the Buyer shall purchase from the Sellers, and the Sellers shall sell, transfer, convey, assign and deliver to the Buyer, at the Closing all of the Sellers' right, title and interest in and to the assets of the Sellers related to the Business set forth in Section 2.01 of the Agreement (the "Acquired Assets").

2.    Notwithstanding the provisions of Section 2.01 of the Agreement, the Acquired Assets shall not include the following assets (collectively, the "Excluded Assets"):

a.    Cash and Cash Equivalents. All cash and cash equivalents (including marketable securities and short-term investments);

b.    Certain Claims. Any Chapter 5 Claims and any Seller Claims that relate exclusively to an Excluded Asset;

---

[4]    This summary of the Agreement is provided for the Court's convenience only. To the extent that the summary differs in any way from the terms of the Agreement, the terms of the Agreement shall control. Capitalized terms used but not defined in this summary shall have the meanings given in the Agreement.

c.  Corporate Documents.  Corporate seals, certificates of incorporation, minute books, stock transfer records, or other records related to the corporate organization of Sellers;

d.  Employee Benefit Contracts.  Seller Employee Benefit Plans and contracts of insurance for employee group medical, dental and life insurance plans;

e.  Records.  All personnel records and other Books and Records, including Tax Returns, that Sellers are required by applicable Law to retain in their possession;

f.  Deposits and Unbilled Receivables.  Any Deposits and Advances solely related to any of the Excluded Assets or Excluded Liabilities and all unbilled Receivables with a balance of zero or less;

g.  Insurance Policies.  All insurance policies and rights thereunder except to the extent specified in Section 2.01(a)(x) of the Agreement;

h.  Contracts.  Any Contracts which are not Assumed Executory Contracts as of the Effective Time;

i.  Taxes.  All claims for refund of Taxes and other amounts collected by any Governmental Authority to the extent such Taxes and other amounts were paid by Sellers, and all rights to Tax loss carryforwards of any Seller;

j.  Rights under Transaction Documents.  All rights of Sellers under the Transaction Documents;

k.  Director and Officer Claims.  Any claims against Sellers' directors and officers;

l.  Unusable Assets.  Any tangible assets that are determined by Buyer in its sole discretion, either prior to or within a reasonable period following the Closing, to be obsolete, scrap, refuse, materially damaged or otherwise unusable as of the Effective Time;

m.  Water Treatment Units for Non-Assumed Contracts.  Water treatment units subject to Contracts which are not Assumed Executory Contracts and located on Third Party premises as of the Effective Time; and

DB02:8479765.1

068172.1001

n. <u>Other Excluded Assets</u>. Other assets of Sellers not transferred to Buyer (or its designated Affiliate(s)) as set forth on Exhibit D of the Agreement.

b. Assumed Obligations and Excluded Liabilities.

   1. Assumed Obligations. The Buyer shall assume no Liabilities of any of the Sellers except as set forth in Section 2.03 of the Agreement. Effective as of the Effective Time and subject to the conditions of the Agreement, the Buyer shall assume from Sellers and thereafter pay, perform and discharge when due, the following, and only the following, Liabilities of the Sellers (the "<u>Assumed Obligations</u>"):

      a. the Liabilities and obligations of Sellers created or incurred by events arising after the Effective Time under the Assumed Executory Contracts or the assumed Government Approvals;

      b. Property Taxes to the extent specifically allocated to Buyer pursuant to Section 9.05(b) of the Agreement;

      c. Liabilities explicitly assumed by Buyer pursuant to Article 6 of the Agreement;

      d. all other Liabilities with respect to the Acquired Assets created or incurred by events arising after the Effective Time; and

      e. the costs of cure required to be satisfied in order for Sellers to assume and assign each Assumed Executory Contract under Section 365 of the Bankruptcy Code as determined by the Bankruptcy Court at the Sale Hearing (collectively, the "<u>Final Cure Costs</u>").

   2. Excluded Liabilities. The Buyer shall not assume, or in any way be liable or responsible for, any Liabilities of any of the Sellers or any other Person except for the Assumed Obligations (collectively, "<u>Excluded Liabilities</u>").

c. <u>Purchase Price</u>. The aggregate consideration for the Purchased Assets (the "<u>Purchase Price</u>") shall be cash in an amount equal to the following: Two Million Dollars ($2,000,000) less (i) applicable Final Cure Costs and (ii) the amount by which $2,900,000 exceeds the Acquired Receivables Amount as of Closing, subject to the satisfaction of all closing conditions.

d. <u>The Closing</u>. Upon the terms and subject to the conditions of the Agreement, the closing of the transactions contemplated by the Agreement

DB02:8479765.1 068172.1001

(the "Closing") shall take place at the offices of Morrison & Foerster LLP, 12531 High Bluff Drive, Suite 100, San Diego, California 92130, or such other place as Buyer and Sellers may mutually agree, as soon as practicable but in no event later than the third (3rd) Business Day following the date upon which all of the conditions set forth in Article 7 of the Agreement have been satisfied or waived or upon such other date as Buyer and Sellers may mutually agree; provided, however, that, absent an order from the Bankruptcy Court that rescinds the automatic ten (10) say stay following entry of the Sale Order, Buyer may elect, in its sole discretion, to delay the Closing until a date not later than the eleventh (11th) calendar day following the date upon which all of the conditions ser forth in Article 7 of the Agreement have been satisfied or waived in accordance with the Agreement (the "Closing Date").

e. <u>Breakup Fee and Expense Reimbursement</u>. Sellers shall have the obligation to promptly pay Buyer:

1. the Expense Reimbursement, in an amount equal to all reasonable and actual out-of-pocket and third-party costs and expenses incurred by Buyer in connection with Buyer's due diligence investigation of Sellers and the Business and the negotiation, execution and delivery of the Agreement and the other Transaction Documents and the transactions contemplated by the Agreement, in an amount not to exceed $350,000, if Buyer terminates the Agreement pursuant to Section 8.01(c), or Section 8.01(d) (other than due to the failure of the condition set forth in Section 7.01(m) of the Agreement to be met); or if either party terminates the Agreement pursuant to Section 8.01(g), provided that the Closing shall not have been consummated by the date that is seventy-five (75) calendar days following the commencement of the Bankruptcy Case; or

2. fifty percent (50%) of the Expense Reimbursement (A) if Buyer terminates the Agreement pursuant to Section 8.01(f) of the Agreement, provided that the Sale Order has not been entered within sixty (60) calendar days after the commencement of the Bankruptcy Case; or (B) if Buyer terminates the Agreement due to the failure of the condition set forth in Section 7.01(i) of the Agreement to be met; or

3. the Breakup Fee in the amount of $75,000 and the Expense Reimbursement if the Buyer or Sellers terminates the Agreement pursuant to Section 8.01(e) of the Agreement (provided that, subject to Section 8.02(b) of the Agreement, the Breakup Fee and the Expense Reimbursement shall be payable upon consummation of an Alternative Transaction and satisfied out of the proceeds of such Alternative Transaction).

12

The Breakup Fee and/or the Expense Reimbursement payable pursuant to Section 8.02 of the Agreement shall be a super-priority administrative expense claim senior to all other administrative expense claims of Sellers under Section 364(c)(1) of the Bankruptcy Code.

f.  <u>Conditions to Obligations</u>.  The obligation of the Sellers and Buyer to consummate the transactions to be performed by them in connection with the Closing are subject to the satisfaction or waiver of various closing conditions contained in Article 7 of the Agreement, which include but are not limited to the Bankruptcy Court entering the Bid Procedures Order and Sale Order and the unwinding of certain sale and lease-back transactions as set forth in Section 7.01(j) of the Agreement.

g.  <u>Termination of Agreement</u>.  The Agreement may be terminated at any time prior to the Closing as follows:

   1.  by mutual written agreement of Buyer and Sellers;

   2.  by either Buyer or Sellers if there shall be in effect a Final Order (other than a Final Order with respect to an Alternative Transaction) restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by the Agreement;

   3.  by either Buyer or Sellers (provided that the terminating Party is not then in material breach of any representation, warranty, covenant or other agreement contained in the Agreement), if there shall have been a material breach or misrepresentation of any of the representations or warranties or a material breach of any of the covenants or obligations set forth in the Agreement on the part of Sellers, on the one hand, or Buyer, on the other hand, which breach would give rise to the failure of the conditions set forth in Section 7.01 or Section 7.02 of the Agreement, as applicable, and such breach is not cured within fifteen (15) calendar days following written notice to the Party committing such breach or which breach, by its nature, cannot be cured prior to the Closing;

   4.  by Buyer or Sellers (provided that the terminating Party is not then in material breach of any representation, warranty, covenant or other agreement contained in the Agreement) if it shall have been reasonably determined that a material condition set forth in Section 7.01 or Section 7.02 of the Agreement, as applicable, for the benefit of the terminating Party has not been or cannot be fulfilled or satisfied prior to the date that is sixty (60) calendar days following the date of the Agreement and has not been waived by the terminating Party, <u>provided</u>, <u>however</u> that the terminating Party shall not be responsible for the failure of such condition to be satisfied;

DB02:8479765.1                    068172.1001

5. by Buyer or Sellers if Sellers (i) designate any Person other than Buyer as the successful bidder of the Auction, seek or support Bankruptcy Court approval of an Alternative Transaction, or file a plan under Chapter 11 of the Bankruptcy Code that contemplates the sale or retention of the Acquired Assets in a manner substantially inconsistent with the terms of the Agreement or (ii) execute and deliver an agreement or understanding of any kind with respect to any of the items described in the foregoing clause (i); provided, however that, in the event Buyer is the Backup Bidder (as such term is defined in the Bid Procedures attached to the Bidding Procedures Order), Buyer may not terminate the Agreement pursuant to Section 8.01(e) thereof until the later of (i) two (2) Business Days after the closing of the transaction(s) pursuant to which all of the Acquired Assets that were subject to such Backup Bid (as such term is defined in the Bid Procedures attached to the Bidding Procedures Order) have been transferred to one or more Qualified Bidders (as such term is defined in the Bid Procedures attached to the Bidding Procedures Order) pursuant to the Bid Procedures attached to the Bidding Procedures Order, and (ii) eleven (11) calendar days after the date of the Auction;

6. by Buyer if: (i) the Bidding Procedures Order, is not entered on or before the date that is twenty (20) calendar days following the commencement of the Bankruptcy Case, or is stayed reversed, amended (in a form not reasonably acceptable to Buyer) or vacated, (ii) the Sale Order, has not been entered within fifty (50) calendar days after the commencement of the Bankruptcy Case, or if after such entry, such Sale Order has not, within eleven (11) calendar days after its entry, become a Final Order, or (iii) if, prior to the Closing Date, Sellers' case is converted to a case under Chapter 7 of the Bankruptcy Code, a trustee or examiner with expanded powers is appointed in the Bankruptcy Case or the Bankruptcy Case is dismissed or if a motion is filed by Sellers seeking any of the foregoing; or

7. by Buyer (on any day on or after the date that is sixty-five (65) calendar days following the commencement of the Bankruptcy Case) or Sellers (on any day on or after the date that is one hundred twenty (120) calendar days following the commencement of the Bankruptcy Case) if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Buyer and Sellers in writing), unless the Closing has not occurred due to a material failure of the terminating Party to perform or observe its covenants or obligations as set forth in the Agreement required to be performed or observed by it on or before the Closing Date including (without limitation) the covenants and obligations set forth in Section 5.05 of the Agreement.

DB02:8479765.1 068172.1001

### C. Proposed Bid Procedures[5]

24.     The Debtors desire to receive the greatest value for the Assets.  Although the Debtors have undertaken significant efforts to market the Assets over the past seven (7) months, in order to reach a broader pool of possible purchasers and to seize on possible sale opportunities before any declination in value, the Debtors believe that it is imperative that they promptly move forward with approval and implementation of the Bid Procedures.  Accordingly, the Bid Procedures (detailed on Exhibit 1, annexed hereto) were developed consistent with the Debtors' need to expedite the sale process, but with the objective of promoting active bidding that will result in the highest and best offer the marketplace can sustain for the Assets.  Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Assets by financially able, motivated bidders who are likely to close a transaction.

25.     The Debtors submit that implementation of the Bid Procedures will facilitate the bidding for the Assets.  The Debtors do not believe that at this juncture, given their available liquidity and the need to sell the Assets on an expedited basis, approval of the Bid Procedures will chill any bidding.  Quite to the contrary, approval of the Bid Procedures is in the best interests of the Debtors, their estates and their creditors in that it provides a structure and format for all potentially interested parties to equally formulate a bid for the Assets and participate in the sale process.  Failure to approve the Bid Procedures may jeopardize a sale to the detriment of the Debtors' estates and creditors.

---

[5]     As noted below, to facilitate the Bid Procedures, the Debtors respectfully request the Bid Deadline (as defined below) be no later than August 20, 2009 at 4:00 p.m. (ET), the Auction (as defined below) be scheduled for no later than August 25, 2009; and the Sale Hearing be scheduled, at the convenience of the Court, no later than August 25, 2009 if no competing bids are received, and August 28, 2009 if competing bids are received.

068172.1001

## D.    *Break-Up Fee and Expense Reimbursement*[6]

26.    As stated above, the Debtors seek this Court's approval of the Expense Reimbursement and Break-Up Fee in the amounts set forth in Section 5.04(b) of the Agreement.  The Debtors seek authorization to pay to buyer:  (a) the Expense Reimbursement if Buyer terminates the Agreement pursuant to Section 8.01(c), or Section 8.01(d) (other than due to the failure of the condition set forth in Section 7.01(m) of the Agreement to be met, or if either party terminates the Agreement pursuant to Section 8.01(g) of the Agreement; provided that the Closing shall not have been consummated by the date that is seventy-five (75) calendar days following the commencement of the Bankruptcy Case; or (b) fifty percent (50%) of the Expense Reimbursement (i) if Buyer terminates the Agreement pursuant to Section 8.01(f) of the Agreement, provided that the Sale Order has not been entered within sixty (60) calendar days after the commencement of the Bankruptcy Case, or (ii) if Buyer terminates the Agreement due to the failure of the condition set forth in Section 7.01(i) of the Agreement to be met; or (c) the Breakup Fee and the Expense Reimbursement if the Buyer or Sellers terminates the Agreement pursuant to Section 8.01(e) (provided that, subject to Section 8.02(b) of the Agreement, the Breakup Fee and the Expense Reimbursement shall be payable upon consummation of an Alternative Transaction and satisfied out of the proceeds of such Alternative Transaction).

27.    The Breakup Fee and/or the Expense Reimbursement payable pursuant to the procedure described above shall be a super-priority administrative expense claim senior to all other administrative expense claims of Sellers under Section 364(c)(1) of the Bankruptcy Code.

---

[6]    To the extent that there is an inconsistency between the Motion and the Agreement in the description of the Break-up Fee and/or Expense Reimbursement, the Agreement shall govern.

### E. *Notice of Sale Hearing, Auction, Bidding Procedures, and Objection Dates*

28. The Debtors seek to have the Sale Hearing scheduled no later than August 25, 2009, if no competing bids are received, and no later than August 28, 2009 if a competing bid is received, with an objection deadline for such Sale Hearing set for August [25], 2009 at 4:00 p.m. (prevailing Eastern Time).

29. Not later than three (3) days after entry of this Order, the Debtors will serve the *Notice of Auction and Sale*, substantially in the form annexed hereto as <u>Exhibit 2</u>, to be sent by first-class mail postage prepaid to (i) all entities that claim any interest in or lien on the Assets; (ii) all parties to Contracts (as defined below); (iii) all governmental taxing authorities that have, or as a result of the sale of the Assets may have, known claims, contingent or otherwise, against the Debtors; (iv) all parties that filed requests for notices under Bankruptcy Rule 9010(b); (v) all known creditors (whether liquidated, contingent or unmatured) of, and interest holders in, the Debtors; (vi) all known interested governmental, pension, and environmental entities, including, but not limited to, the Securities Exchange Commission and the Office of the United States Attorney for the District of Delaware; (vii) the Office of the United States Trustee; and (viii) all entities that have, within the past 12 months, expressed to the Debtors an interest in purchasing the Assets.

30. Not later than ten (10) days after the entry of an Order approving this Motion, the Debtors shall cause the Auction and Sale Notice, in a form substantially similar to the form attached hereto as <u>Exhibit 2</u>, to be published in the national edition of one of the following: The Wall Street Journal, The New York Times, or The USA Today, as to be determined by Debtors, pursuant to Bankruptcy Rule 2002(l). Such publication notice shall be sufficient and proper notice to any other interested parties, including those whose identities are unknown to Debtors.

31.     Further, to facilitate the sale, assumption, and assignment of any executory contracts and unexpired leases (collectively, the "Contracts"), the Debtors will serve, via first class mail, a notice (the "Cure Amount Notice"), similar to the form attached hereto as Exhibit 3, not later than three (3) days after the entry of an Order approving the Motion on each counterparty to the Contracts.

32.     The Debtors will attach to the Cure Amount Notice their calculation of the undisputed cure amounts that the Debtors believe must be paid to cure all prepetition defaults under the Contracts (the "Prepetition Cure Amounts"). If no amount is listed on the Cure Amount Notice, the Debtors contend that there is no Prepetition Cure Amount. Unless the non-debtor party to a Contract files an objection (the "Cure Amount Objection") to its scheduled Prepetition Cure Amount by 4:00 p.m. on August 14, 2009 and serves the objection upon the Notice Parties, then the Debtors may assume and assign such Contract to the Buyer or the Successful Bidder, and such non-debtor party shall (i) be forever barred from objecting to the Prepetition Cure Amount and from asserting any additional cure or other amounts owing with respect to such Contract, including, but not limited to, any defaults existing under such Contract and the Debtors, Buyer or such other Successful Bidder shall be entitled to rely solely upon the Prepetition Cure Amount; (ii) be forever barred and estopped from asserting or claiming against the Debtors, the Buyer, or such other Successful Bidder or any other assignee of the relevant Contract, that any additional amounts are due or defaults exist under such Contract, and (iii) be deemed to consent to the assumption and/or assignment of such Contract. In addition, non-debtor parties to any Contract must file and serve objections, if any, to the adequate assurance of future performance under the Contract (if and as assumed) so as to be received by the Notice Parties by August 14, 2009, at 4:00 p.m. (prevailing Eastern Time).

DB02:8479765.1                                                              068172.1001

33.	In the event that a Cure Amount Objection is timely filed, the Cure Amount Objection (i) must set forth the basis for the objection, (ii) must set forth, with specificity, the amount the party asserts as the Prepetition Cure Amount, and (iii) have attached to it appropriate documentation in support of the Prepetition Cure Amount.

34.	Hearings on any Cure Amount Objections may be held (a) at the Sale Hearing, or (b) on such other date as the Debtors may designate, provided that if the subject Contract is assumed and assigned prior to such hearing, the cure amount asserted by the objecting party (or such lower amount as may be fixed by this Court) shall be deposited and held in a segregated account pending further order of this Court or mutual agreement of the parties.

35.	The Debtors' decision to assume and assign a Contract is subject to Court approval and consummation of the Proposed Sale of the Assets.  Absent consummation of the Proposed Sale of the Assets, each of the Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to further administration under the Bankruptcy Code.

36.	Except to the extent otherwise provided in the Agreement or the agreement with the Successful Bidder, subject to payment of the cure amount determined by the Court (the "Cure Payment"), the assignee of any assumed section 365 Contract will not be subject to any liability to the assigned section 365 Contract counterparty that accrued or first arose before the closing date of the Proposed Sale of the Assets, and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to Bankruptcy Code § 365(k).

37.	Objections, if any, to the relief requested in the Sale Motion, including any objections under Section 365(b)(1)(c) of the Bankruptcy Code, must:  (a) be in writing; (b)

DB02:8479765.1	068172.1001

comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (c) be filed with the Clerk of the Bankruptcy Court for the District of Delaware, 3rd Floor, 824 Market Street, Wilmington, Delaware 19801, on or before 4:00 p.m. (prevailing Eastern Time) on August 14, 2009; and (d) be served so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon:  (i) Counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street , 17th Floor, Wilmington, DE, 19801, Attention: Michael R. Nestor, Esq.; (ii) special counsel to the Debtors, Latham & Watkins, LLP, 335 South Grand Avenue, Los Angeles, CA 90071-1560, Attention Robert A. Klyman, Esq.; (iii) the Buyer, Amplio Filtration Holdings, Inc., c/o Amplio Partners, 21 Arlington Street, London, SW1A 1RN, Attention: Andrea Davi; (iv) counsel for the Buyer, Morrison Foerster, LLP, 12531 High Bluff Drive, Suite 100, San Diego, CA 92130, Attention: Jay de Groot, Esq.; and (v) counsel to any statutory committee, if appointed (collectively, the "Notice Parties"); provided, however, if the Buyer is not the Successful Bidder and an alternative Successful Bidder is seeking to have certain Contracts assumed and assigned as part of an alternative transaction, the non-debtor parties to such Contracts shall have until the Sale Hearing to raise objections under section 365(b)(1)(C) of the Bankruptcy Code.  The failure of any person to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Motion or the Debtors' assumption and assignment of any Contract or the consummation of the Proposed Sale of Assets and performance under the Agreement (or any alternative agreement entered into with the Successful Bidder), including the transfer of the Assets free and clear of all liens, claims, encumbrances, and interests (other than permitted encumbrances provided for expressly in the Agreement or alternative purchase agreement entered into with the Successful Bidder).

DB02:8479765.1                                                                                                    068172.1001

38.    The Debtors request that the Sale Hearing be held before this Court on or before August 25, 2009 if no competing bids are received and on or before August 28, 2009, if a competing bid is received.  The Sale Hearing may be adjourned, from time to time, without further notice to creditors or other parties-in-interest other than by announcement of said adjournment before this Court or on this Court's calendar on the date scheduled for said hearing.

39.    The Debtors request that the Court approve the notices to be issued in connection with the Proposed Sale of the Assets substantially in the form of the notices attached hereto as Exhibits 2 and 3.

## BASIS FOR RELIEF

40.    Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  As described above, approval of the Bid Procedures will greatly assist the Debtors in maximizing the value that they may obtain for the Assets.  Consequently, the Debtors respectfully submit that granting the requested relief is "appropriate" under the circumstance.

41.    Once the Debtors articulate a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  *In re S.N.A. Nut Company*, 186 B.R. 98 (Bankr. N.D. Ill. 1995) (internal quotation, citation omitted); *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

21

42.     Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making. *See Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981).  Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefor. *See Schipper*, 933 F.2d at 515; *In re Lionel Com.*, 722 F.2d at 1071; *In re Delaware Hudson Ry. Co.*, 124 B.R. 169 at 179.

43.     The Bid Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtors' estates for their creditors, customers and employees.  The proposed procedures contain terms typical for a process through which a Sale of this nature is consummated, and the adoption of the Bid Procedures represents a sound exercise of the Debtors' business judgment.

44.     The Debtors have sound business justifications for seeking approval of the Bid Procedures at this juncture.  The Debtors believe it is in the best interests of their estates, creditors, customers and employees to commence an auction process immediately, as the Debtors have limited funding and resources, to try to maximize the value of their assets and maintain a core workforce.  While the Debtors have undertaken certain efforts to reduce expenses and are in the process of stabilizing their business, it is questionable whether they will be able to continue operating beyond the period of this proposed bidding process without additional funding, which may not be forthcoming.  In addition, the Sale of the Assets provides a realistic means for the continuation of services for the Debtors' customers with minimal interruption and inconvenience.  Absent a Sale, the Debtors may be forced to cease operations and wind down their affairs, leaving customers scrambling to find alternatives to the goods and services the Debtors provide—which would be different.  For these reasons, the Debtors have

determined, based upon their business judgment, that the best option for maximizing the value of their estates for the benefit of their creditors, customers, employees and other parties in interest is through a sale of the Assets pursuant to the Bid Procedures.

45. In addition, the Debtors' request for approval of the Break-Up Fee and Expense Reimbursement Fee should be approved as an appropriate exercise of the Debtors' business judgment, and because they provide a benefit to the bankruptcy estates by encouraging competitive bidding and incentivizing the Buyer to serve as a Buyer in these cases. For example, in *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F. 3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the debtor's estate. *Id.* at 533.

46. The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, benefit may be found if the bidding procedures and protections "promote[] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

47. Whether evaluated under Section 105(a) of the Bankruptcy Code, the business judgment rule, or the Third Circuit "administrative expense" standard, approval of the

Bidding Procedures, including the Expense Reimbursement and Break-Up Fee and other bidding protections, described above are appropriate and necessary to maximizing the value Debtors may obtain for all or portions of their Assets.

48.     The Bidding Procedures are designed to encourage competitive bidding. The Break-Up Fee and Expense Reimbursement are material inducements for, and conditions of, the Buyer's entry into the Agreement. The Debtors believe they are fair and reasonable in view of the analysis, due diligence investigation, and negotiation undertaken by the Buyer in connection with the Sale. Moreover, the Agreement with Buyer is expressly conditional upon approval of the Break-Up Fee and Expense Reimbursement as provided above. The Buyer's bid will serve as a floor for other bids and will induce other bids that otherwise would not have been made or otherwise would have been limited. Thus, the Break-Up Fee and Expense Reimbursement (to some extent if not in total) will be covered by the proceeds that will be realized from the alternative transaction with the higher and better bidder. This is obviously a benefit to the Debtors' estates.

49.     The Break-Up Fee and Expense Reimbursement are the products of extended good faith, arm's-length negotiations between the Debtors and the Buyer. They are fair and reasonable in amount, particularly in view of the Buyer's efforts to date, the risk to the Buyer of being used as a "stalking horse," and the stabilizing effect that the execution of the Agreement is expected to have on the Debtors' business (thereby preserving value for creditors and increasing the likelihood of additional bidding).

50.     Accordingly, the Debtors request that the Court authorize payment of the Bidding Procedures, the Break-Up Fee Expense Reimbursement and approve the other bidder protections.

## NOTICE

51.     No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases. The Debtors have served notice of this Motion on (a) the Office of the United States Trustee, (b) the United States Securities and Exchange Commission, (c) the Office of the United States Attorney for the District of Delaware, (d) the Internal Revenue Service, (e) the Debtors' twenty (20) largest unsecured creditors on a consolidated basis; and (g) all parties entitled to notice under Local Rule 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

**WHEREFORE**, the Debtors respectfully request that the Court enter an Order, substantially in the form annexed as Exhibit A hereto, granting this Motion and such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
July 17, 2009

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Michael R. Nestor (No. 2202)
Joseph M. Barry (No. 4221)
Jaime N. Luton (No. 4936)
Kevin P. Garland (No. 5171)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone:     (302) 571-6759
Facsimile:     (302) 571-1253

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

DB02:8479765.1

068172.1001